NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

MAKAN DOUCOURE,

        Petitioner,

        v.

MICHAEL CHERTOFF, at al.,

        Respondents.

Civil Action No.
06-6038 (WJM)

O P I N I O N

APPEARANCES:

    MAKAN DOUCOURE, Petitioner pro se
    Elizabeth Detention Facility
    Elizabeth, New Jersey  07201

WILLIAM J. MARTINI, District Judge

On October 6, 2006, Petitioner MAKAN DOUCOURE (hereinafter "Petitioner") filed his application, pursuant to 28 U.S.C. § 2241 (hereinafter "Petition"), with the United District Court for the Southern District of Alabama, challenging Petitioner's confinement. See Transfer Docket, Entry No. 8-11.  On December 18, 2006, the Petition was transferred to this Court.  See Docket Entry No. 8. For the reasons stated below, the Petition will be denied without prejudice.


## BACKGROUND

On January 5, 2007, this Court issued an Order directing Respondents to show cause as to why the Petition should not be granted. See Docket Entry No. 10. On February 17, 2007, Respondents filed their response. See Docket Entry No. 12 (hereinafter "Answer"). In their Answer, Respondents stated that Petitioner had represented to Respondents that he was a native and citizen of Mauritania. See Ans. at 2 (citing Pet. ¶¶ 10-11). Respondents further stated that Petitioner's removal proceedings commenced on December 19, 2002, and his final order of removal was entered on November 4, 2004, thus triggering Petitioner's period of removal from the United States. See id. at 3, Ex. A-13.

However, almost two and a half years after Petitioner's removal order became final, Respondents' efforts to obtain a proof of Petitioner's Mauritanian citizenship sufficient for the Consulate General of Mauritania (hereinafter "Consulate") to issue Petitioner travel documents (necessary for Petitioner's removal) have been unsuccessful. See id. at 3-5, 8-9. Respondents alleged that such lack of success in Petitioner's removal was a result of Petitioner's dilatory tactics and persistent non-cooperation with the authorities charged with the task of Petitioner's removal. See id. Specifically, Respondents asserted that, when the Consulate determined that Petitioner's Petitioner's Mauritanian Identity Card was fraudulent and requested Petitioner to supply another

documentary evidence of Petitioner's Mauritanian nationality, Petitioner did not comply with the request. See id. at 3, Ex. A-58. Moreover, Petitioner twice refused to sign acknowledgments for the Warnings issued to Petitioner. See id. at 3, Exs. A-82, A-83. Furthermore, during three interviews of Petitioner by the Mauritanian Embassy (hereinafter "Embassy") arranged for by Respondents, Petitioner did not provide the Embassy with any information convincing the Embassy that Petitioner is Mauritanian and, thus, providing the Embassy with a reason to issue Petitioner the necessary of travel documents. See id. at 4, Exs. A-65, A-66. Finally, when the Embassy required Petitioner to produce a sworn statement from a Mauritanian sponsor who could vouch for Petitioner's Mauritanian nationality, Petitioner identified his Mauritanian roommate in the United States as such sponsor, but the affidavit eventually produced by this roommate contained no reference whatsoever as to Petitioner's nationality or citizenship, hence prompting the Embassy to conclude that Petitioner was not Mauritanian. See id. at 4, Exs. A-64 to A-64d, A-65. Thus, Respondents, in their Answer, urged this Court to deny Petitioner's application arguing that "grant of habeas corpus release under these circumstances would reward [P]etitioner's unlawful refusal to cooperate with the authorities." Id. at 9.

In view of Petitioner's poor record of cooperation with the authorities charged with the task of Petitioner's removal, the

Court had no reason to grant Petitioner the requested relief. However, the Court also recognized the possibility of a scenario under which

(1) Petitioner did not know what additional evidence he should produce to cooperate and duly assist the authorities charged with the task of Petitioner's removal; or

(2) Petitioner knew what additional evidence he should produce to cooperate and duly assist the authorities charged with the task of Petitioner's removal but had no reasonable means to obtain such evidence in view of Petitioner's current status of an immigration detainee and the ensuing confinement; or

(3) Petitioner knew what additional evidence he can obtain regardless of Petitioner's confinement, but Mauritanian authorities flatly refused to

   (a) accept *any* immigration detainee of Mauritanian origin; or

   (b) accept Petitioner, *personally*, regardless of any evidence that Petitioner might produce verifying his Mauritanian citizenship.

Recognizing that any of these scenarios places Petitioner into a "legal limbo" where Petitioner's decision to mend his ways and begin to duly cooperate with the authorities charged with the task of Petitioner's removal would have no consequence (since Petitioner would either be unable to obtain Mauritanian travel documents from Mauritanian authorities and get himself removed to Mauritania, or

be unable to qualify for release from his current confinement by proper cooperation with the United States government), this Court issued another Order (hereinafter "March Order"), directing Respondents to file a detailed list of specific documentary evidence that (1) could be reasonably obtained by Petitioner while he is incarcerated, and (2) might establish Petitioner's Mauritanian citizenship--or lack thereof--with the degree of certainty reasonably likely to prompt the Consulate to conclusively acknowledge Petitioner as a Mauritanian or as a non-Mauritanian (and, consequently, prompt Mauritanian authorities to issue or conclusively deny Petitioner Mauritanian travel documents). See Docket Entry No. 15.

On May 21, 2007, Respondents filed their reply (hereinafter "Reply") to the March Order. See Docket Entry No. 18. The Reply stated, inter alia,

> [t]he best documents [that Petitioner can provide as a proof of his Mauritanian origin and to show his cooperation with the authorities charged with the task of Petitioner's removal] are a passport (current or expired), a birth certificate, any authentic identity cards (e.g. a license, voter card, or cedula). [Since Respondents] know that the Petitioner does not have such primary evidence in this case[,] Respondents suggest that [Petitioner] write to his former roommate to obtain another affidavit that explicitly addresses Petitioner's nationality . . . [(]if the roommate does not write English, Petitioner's lawyer can assist [the roommate)]. At the same time, Petitioner should write to his family to request copies of his birth certificate, passport, national identity card. (According to information Petitioner provided, his parents lived in . . . Mali in 2004. . . . ) In light of Petitioner's claim that his family left Mauritania when he was approximately nine

years old, family members might not have those documents. In that event, he should ask his family to send him copies of his parents' birth certificates, passports, party membership cards, or visas to Mali. A sworn affidavit from a family member that provides the address(es) in Mauritania where the Petitioner lived and the school(s) he attended would give the Consulate a starting point to verify Petitioner's claim to citizenship. [Respondents] note that [someone named] Goppe Doucoure submitted a letter to verify Petitioner's employment. . . . If [Goppe Doucoure] is a relative who can verify Petitioner's citizenship, [Petitioner] should endeavor to get a sworn affidavit from him. Getting creative, Petitioner could write to his family for copies of his Mauritanian school report cards, a photograph of his former home with a street sign, a newspaper article with his picture. He could write to his elementary school if he attended one in Mauritania. A sworn statement from a former teacher might be persuasive. [In addition, Petitioner] should supply [Respondents] with proof that he has sent letters requesting this type of evidence [since] that, at the very least, would demonstrate good faith in attempting to assist [in his removal to Mauritania].

Id. at 2.

In view of Respondents' Reply, this Court concludes that the Petition should be dismissed without prejudice.

## JURISDICTION

Under 28 U.S.C. § 2241(c), habeas jurisdiction "shall not extend to a prisoner unless . . . he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). A federal court has subject matter jurisdiction under § 2241(c)(3) if two requirements are satisfied: (1) the petitioner is "in custody,"; and (2) the custody could be "in violation of the Constitution or laws or treaties of the United

States." 28 U.S.C. § 2241(c)(3); see also Maleng v. Cook, 490 U.S. 488, 490 (1989). This Court has subject matter jurisdiction over the instant Petition under § 2241 because Petitioner is detained within its jurisdiction and he asserts that his detention is not statutorily authorized and violates his constitutional rights.

### STANDARD OF REVIEW

Pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

### DISCUSSION

I. **Applicable Legal Framework**

The "removal period" starts on the latest of the following: (1) the date when the order of removal becomes administratively final; or (2) if the removal order is judicially reviewed and if a court orders a stay of the removal, the date of the court's final order, or (3) if the alien is detained or confined (except under an immigration process), the date the alien is released from

confinement.[1]  See 8 U.S.C. § 1231(a)(1)(B).  While, during the "removal period," the alien must be detained, see id. § 1231(a)(2), after the removal period, the government may detain the alien or release him subject to conditions of release.  See id. § 1231(a)(6).  In Zadvydas v. Davis, 533 U.S. 678 (2001), the Supreme Court held that aliens may be detained under § 1231(a)(6) only for "a period reasonably necessary to bring about that alien's removal from the United States."  Id. at 689 (holding that "the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States [and] does not permit indefinite detention").  Recognizing that its holding would lead to difficult judgment calls in the courts, the Supreme Court, "for the sake of uniform administration in the federal courts" recognized a six-month "presumptively reasonable period of detention."  Id. at 700-01.  However, coining this "presumptively reasonable period of detention," the Supreme Court stressed that,

> [a]fter this 6-month period, o[nly if] the alien provides *good reason to believe* that there is no significant

---

[1]  Section 1231(a)(1)(A) provides that the government has a 90-day "removal period" to remove an alien ordered removed from the United States.  Detention during the removal period under Section 1231(a)(1)(A) is mandatory and, in addition, § 1231(a)(1)(C) provides that the removal period shall be extended, and the alien may remain in detention during such extended period, if the alien "acts to prevent the alien's removal subject to an order of removal."  8 U.S.C. § 1231(a)(1)(C).

> likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink. *This 6-month presumption, of course, does not mean that every alien not removed must be released after six months.* To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

Id. at 701 (emphasis supplied).

Moreover, nothing in the language of Zadvydas decision limited the tolling-like function enunciated in 8 U.S.C. § 1231(a)(1)(C), that is, the "non-cooperation"-based quasi-tolling which factors out the period of "non-cooperation" from the six months of presumptively reasonable period annunciated in Zadvydas. Accord Qing Di Wang v. Carbone, 2005 U.S. Dist. LEXIS 24499 (D.N.J. Oct. 17, 2005) (calculating presumptive period excluding the period of non-cooperation and relying on Riley v. Greene, 149 F. Supp. 2d 1256, 1262 (D. Colo. 2001), and Sango-Dema v. District Director, 122 F. Supp. 2d 213, 221 (D. Mass. 2000)). In sum, in order to shift the burden to the government obligating the government to show feasibility of Petitioner's removal, Petitioner must demonstrate that "the circumstances of his status" or the existence of "particular barriers to his repatriation" to his country of origin are such that there is no significant likelihood of removal in the reasonably foreseeable future." See Fahim v. Ashcroft, 227 F. Supp. 2d 1359, 1366 (N.D. Ga. 2002).

## II. Petitioner's Detention Is Proper

While Petitioner has remained in detention for almost three years, the fact alone does not qualify Petitioner for release from custody. See Fahim v. Ashcroft, 227 F. Supp. 2d 1359, 1365-68 (N.D. Ga. 2002) (mere passage of time insufficient to meet alien's burden of proof); Kacanic v. Elwood, 2002 U.S. Dist. LEXIS 21848 (E.D. Pa. 2002) (passage of one year, coupled with inaction of foreign embassy and INS admission that efforts to obtain travel documents have been "fruitless" suffices to meet alien's burden); Khan v. Fasano, 194 F. Supp. 2d 1134, 1136-37 (S.D. Cal. 2001) (where alien has been in post-removal order custody for ten months, and meeting is scheduled with destination country to discuss request for travel documents, delay alone is not sufficient to meet alien's burden). Indeed, Petitioner's record of persistent non-cooperation provides this Court with valid grounds to deny Petitioner habeas relief,[2] since Petitioner's non-cooperation effectively "tolled" and keeps "tolling" Petitioner's Zadvydas period until the time when Petitioner begins to cooperate, in good

---

[2] It would be anomalous to suggest that alien's frustration of government's efforts to remove him would reward the alien with release from custody if the alien is persistent enough to keep his thwarting activities for a period exceeding Zadvydas' six months. "Zadvydas does not save an alien who fails to provide requested documentation to effectuate his removal. The reason is self-evident: the detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock." Pelich v. INS, 329 F.3d 1057, 1060 (9th Cir. 2003).

Page -10-

faith, with the authorities charged with the task of his removal. Indeed, in the case at bar, Petitioner could easily cooperate with Respondents' modest requests.

If Petitioner was/is truthful with the authorities about his Mauritanian citizenship, the abundant list of possible evidence provided by Respondents now allows Petitioner to chose various avenues for cooperation.[3] Moreover, since Petitioner's cooperation efforts requested by Respondents are limited to the task of mere writing letters (which is indeed a feasible undertaking, even for an immigration detainee in confinement), this Court has no reason to conclude that Petitioner is unable to duly cooperate with Respondents if he sincerely wishes to be cooperative.[4]

At the instant juncture, it appears that Mauritanian authorities neither refuse accepting immigration detainees of Mauritanian origin nor refuse accepting Petitioner personally

---

[3] Conversely, if Petitioner is not, in fact, a Mauritanian citizen and, therefore, cannot possibly obtain--or even attempt obtaining--any valid proof of his Mauritanian citizenship, Respondents cannot be expected to remove him to a country having no ties with Petitioner. Cf. Pelich, 329 F.3d at 1060.

[4] Respondents' list of desired evidence presents a reasonable request in view of Mauritanian modern realities. Modern Mauritania is a relatively stable state, see <<https://www.cia.gov/library/publications/the-world-factbook/geos/mr.html#Intro>>, where Petitioner's parents or other relatives can travel with sufficient safety in order to assist Petitioner in obtaining necessary documents and/or information. See State Department Issues Consular Information Sheet on Mauritania, US Fed. News (Nov. 21, 2006).

(provided that Petitioner avails Mauritanian authorities to authentic document(s) or sufficient information leads verifying his Mauritanian citizenship). Therefore, this Court concludes that Petitioner's removal to Mauritania is reasonably foreseeable. The only scenario under which Petitioner's removal is "unforeseeable" is that where Petitioner continues refusing to cooperate with Respondents.[5]

Therefore, Petitioner's instant application will be denied.

---

[5] However, Petitioner's materialization of such scenario will "toll" Petitioner's <u>Zadvydas</u> period, hence preventing Petitioner from a meaningful chance to seek habeas relief. See <u>Zadvydas</u>, 533 U.S. at 701; <u>Pelich</u>, 329 F.3d at 1060.

_____
WILLIAM J. MARTINI
United States District Judge

Dated: June 13, 2007

---

[6]  This Court, however, notes that Petitioner is free to file another § 2241 petition should Petitioner develop good evidence that his removal is no longer reasonably foreseeable. (The Court, however, reminds Petitioner that Petitioner's refusal to cooperate with the authorities charged with the task of Petitioner's removal, e.g., Petitioner's refusal to write at least some letter requests from the list provided by Respondent would keep "tolling" Petitioner's Zadvydas period.  See infra notes 2 and 5.)